FIRST SECURITY SAVINGS BANK v AITKEN

Docket No. 183203. Submitted July 9, 1996, at Detroit. Decided November 4, 1997, at 9:10 A.M.

First Security Savings Bank brought an action in the Macomb Circuit Court against Ian and Marilyn Aitken after the defendants defaulted on a construction loan used to finance the construction of a model condominium at a condominium development promoted by a joint venture, Rattle Run Development Company. The defendants were participants in the joint venture, both as purchasers of a condominium and as investors in the development. As a defense and a counterclaim, the defendants alleged that the plaintiff breached its contract with the development company, which, in turn, precipitated the default of the defendants' loan. Specifically, the defendants alleged that the plaintiff breached its obligation to issue construction loans to other borrowers and that this refusal caused the development to fail. The trial court, John B. Bruff, J., granted the plaintiff's motions for summary disposition and an award of attorney fees, including those incurred in the defense of the counterclaim. The defendants appealed.

The Court of Appeals *held*:

1. The defendants do not have standing to assert a breach of contract claim as a third-party beneficiary on behalf of others.

2. The defendants do not acquire standing by virtue of their status as investors and shareholders in Rattle Run Development Company. The plaintiff did not promise to do something or refrain from doing something directly for the benefit of the development's investors. The defendants do not have standing to raise their breach of contract claim.

3. The doctrine of equitable estoppel provides no assistance to the defendants' breach of contract claim because they were not third-party beneficiaries of an agreement between the plaintiff and the development.

4. The defendants cannot prevail on their claim of promissory estoppel. The defendants cannot establish that there is a clear and definite promise under which the plaintiff's obligation to issue loans became executory without further qualifications or conditions so that the plaintiff's later refusal constituted a breach of that

promise. The defendants presented no evidence that they were aware of an alleged commitment by the plaintiff to issue loans when the defendants claim to have acted in reliance on that promise. Therefore, the defendants cannot establish that they in fact relied on an actual, clear, and definite promise by the plaintiff, or that their acts in reliance on the alleged commitment were reasonable. The defendants did not establish they were entitled to damages for detrimental reliance premised upon a theory of promissory estoppel.

5. The award of attorney fees was proper. The fees with regard to the plaintiff's claim were properly awarded pursuant to the provision of the loan agreement that allowed fees that were spent in connection with the loan agreement. Because the plaintiff was required to defeat the defendants' counterclaim in order to prevail on its complaint, the award of attorney fees with regard to the defeat of the counterclaim was proper.

Affirmed.

1. CONTRACTS — BREACH OF CONTRACT — ACTIONS — PARTIES.

A person who is not a party to an agreement generally cannot pursue a claim for breach of the agreement.

2. CONTRACTS — THIRD-PARTY BENEFICIARIES — BREACH OF CONTRACT — ACTIONS.

A party seeking to establish standing as a third-party beneficiary of a contract and to assert a breach of contract claim against the promisor must prove that the promisor made a promise to the promisee to do or refrain from doing an act directly for the third-party beneficiary's benefit; a court must objectively review the form and meaning of the contract itself to determine whether a party is a third-party beneficiary; the parties' motives and subjective intentions are not relevant; not everyone who benefits in some way from a contract can be classified as a third-party beneficiary so as to be able to stand in the promisee's shoes and recover under the contract (MCL 600.1405; MSA 27A.1405).

3. CONTRACTS — THIRD-PARTY BENEFICIARIES.

A person becomes vested as a third-party beneficiary of a promise only if the person's identity is ascertained before the promise is discharged by agreement between the promisor and the promisee where the beneficiary could not be ascertained at the time the promisor became bound by the promise (MCL 600.1405[2][b]; MSA 27A.1405[2][b]).

4. ESTOPPEL — EQUITABLE ESTOPPEL.

Equitable estoppel is a doctrine and not a cause of action that would entitle a plaintiff to damages, although it may assist a plaintiff in support of its primary claim.

5. ESTOPPEL — PROMISSORY ESTOPPEL — THIRD-PARTY BENEFICIARIES.

To establish promissory estoppel, a party must prove a promise that the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third party and that does induce such action or forbearance; although such a promise is binding if injustice can be avoided only by enforcement of the promise, the remedy granted for breach may be limited as justice requires; to prevail on a claim of promissory estoppel as a third party, the third party must first establish that the promisor made a promise that the promisor intended, or should have reasonably expected, that the third party would rely upon; promissory estoppel requires an actual, clear, and definite promise; reliance is reasonable only if induced by an actual promise.

6. CONTRACTS — PROMISE TO LOAN MONEY IN FUTURE.

Some evidence must exist of the material terms of a loan, including the amount of the loan, the interest rate, and the method of repayment for a promise to loan money in the future to be clear and definite.

7. CONTRACTS — ACTIONS — ATTORNEY FEES.

Contractual provisions for the payment of reasonable attorney fees are judicially enforceable; attorney fees generated in defeating a counterclaim in an action for breach of a contract that provides for an award of attorney fees in an action in connection with the contract may be awarded where it is necessary to defeat the counterclaim in order to prevail on the complaint for breach of contract.

*Beier Howlett, P.C.* (by *Mark W. Hafeli*), for the plaintiff.

*H. Rollin Allen*, for the defendants.

Before: GRIBBS, P.J., and YOUNG and W. J. CAPRATHE*, JJ.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

Young, J. Defendants Ian and Marilyn Aitken appeal as of right from the lower court's orders granting plaintiff First Security Savings Bank's motions for summary disposition and attorney fees. We affirm.

The Aitkens borrowed money from First Security Savings Bank (FSB) under a construction loan agreement. This money financed the construction of a model condominium at a condominium development promoted by a joint venture, Rattle Run Development Company (Rattle Run Development or the development). The Aitkens were participants in the joint venture, both as purchasers of a condominium and as investors in the development. The Aitkens defaulted on the loan, and FSB filed a default action against them.

As a defense and counterclaim to the default action, the Aitkens alleged that FSB breached its contract with Rattle Run Development, which, in turn, precipitated the default of their loan. Specifically, the Aitkens allege that FSB breached its obligation to issue construction loans to other borrowers and that this refusal caused the development to fail. The Aitkens claim that, as third-party beneficiaries, they were entitled to damages stemming from FSB's breach because they detrimentally relied on FSB's promise to Rattle Run Development that FSB would provide other construction loans.

Importantly, the Aitkens do not dispute that FSB granted their construction loan and disbursed funds on that loan. Instead, the Aitkens seek to hold FSB liable for Rattle Run Development's problems that the Aitkens claim resulted from FSB's refusal to continue issuing construction loans to *other* borrowers. Inasmuch as the Aitkens are raising claims that involve

dealings between Rattle Run Development and FSB, they must first establish their legal entitlement, i.e., *standing*, to raise these claims and the bases for the damages they seek.

Accordingly, in this appeal we must address (1) whether the Aitkens have standing as third-party beneficiaries to enforce an agreement between Rattle Run Development and FSB, and (2) given their claim of detrimental reliance, whether the Aitkens can base liability on an estoppel theory. Lastly, we address the Aitkens' claim that FSB was not entitled to attorney fees under the FSB/Aitken loan agreement.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE RATTLE RUN DEVELOPMENT COMPANY CONDOMINIUM VENTURE

Rattle Run Development was a joint venture formed to promote a condominium development in China Township. The Rattle Run Development joint venture partners were Rattle Run Real Estate Company, Rattle Run Investment Company, H. Rollin Allen, Edward Powers, and Fay Knoll. Amos Knoll was hired as a consultant for the joint venture. As stated, the Aitkens were participants in the joint venture as purchasers of a model condominium and as investors in the development.

In 1989, Amos Knoll worked to obtain financing arrangements for construction, bridge, and end loans for the development. To that end, he entered negotia-

---

[1] The Aitkens also appealed from the court's denial of their motion to consolidate this case with another action involving similarly situated investor/borrowers against FSB. This issue has been rendered moot by the dismissal of the appeal pursuant to the stipulation of the parties in that case.

tions with Nels Rouleau, then an employee of Interfirst Bank. Interfirst subsequently agreed to provide these loans, and had approved certain loans when Nels Rouleau left Interfirst and became an employee of FSB. At that point, Mr. Rouleau contacted the development to solicit the joint venture's business from Interfirst to FSB, which solicitation proved successful.

After negotiations,[2] FSB Senior Vice President Mark Hammond sent a letter dated January 3, 1990, to the attention of Amos Knoll, stating:

> First Security Savings Bank will provide construction draw and end loan residential first mortgages to qualified borrowers in the new Rattle Run Site condominium subdivisions. First Security will require at all times a minimum of 20% down payment in all buildings before a closing can occur and before draws will be disbursed. First Security will only lend to qualified owner occupant borrowers. Before First Security will close any end loan mortgages, the condominiums will have to have all common amenities fully completed and meet First Security's site condominium guidelines.
>
> First Security will also finance condominium units for construction draw loans with a minimum of 25% downpayment [sic] on an entire building to qualified owner occupants. Before First Security will close any end loan mortgages, the condominiums will have to fully satisfy all of First Security's condominium guidelines. This will include, but not be limited to, satisfying a 70% presold requirement and meeting all necessary fidelity bond coverage.

---

[2] When the parties began negotiating, FSB stated in a letter dated December 21, 1989, that it "intends to" and "will consider" providing financing for the development. In Amos Knoll's deposition, he testified that he requested a firmer commitment from FSB, and a January 3, 1990, letter quoted later in the text followed. That letter changed the conditional language of the earlier letter to "will provide" financing.

> In all situations, First Security will require a first lien position on all pieces of property.

H. Rollin Allen, president of H. R. Allen Realty Co., notified the Aitkens and other prospective purchasers that "[a]rrangements have been made with FIRST SECURITY SAVINGS BANK to *process* all construction loans for the development." (Emphasis added.) The Aitkens, along with other condominium purchasers, applied for financing from FSB with Nels Rouleau, who was then working as FSB's loan originator.

Rattle Run Development also proceeded to negotiate with China Township to obtain building permits and to bring to the project site water and sewer service that were required both by the township and FSB. The development and the township subsequently entered into a planned unit development agreement (PUD) on June 7, 1990. As a condition of the PUD, Rattle Run Development was obligated to obtain an irrevocable letter of credit to finance the installation of sewer and water systems. Significant to this case, the PUD stated that all construction would cease unless Rattle Run Development obtained the letter of credit. After the PUD was executed, China Township issued complete building permits for three model condominiums, including the Aitkens' condominium.

FSB closed on the Aitkens' condominium loan along with two additional construction loans and began to disburse funds on all three. FSB thereafter approved construction loans for at least fifteen other applicants, and issued commitment letters to that effect. The commitment letters provided that closing on the loan was, in part, conditioned on issuance of a building permit. The evidence indicates that when the

commitment letters were issued, the township had not issued complete building permits to build more condominiums, but would issue only restricted permits allowing the construction of basements.

Thereafter, Rattle Run Development ran into problems with the township when the development was unable to obtain the irrevocable letter of credit within the time required by the PUD. The township would not issue complete building permits for any additional condominiums. On November 20, 1990, Amos Knoll wrote to the township stating that a bank had committed to issue a letter of credit to finance the construction of water and sewer facilities. Knoll explained that the letter of credit had not been obtained at that time because the bank required a twenty percent fee to issue the letter of credit, and he requested that the township inform him of the final amount that the project would cost in order to calculate the fee that the letter of credit would entail. In the letter, Knoll wrote, "I do not want to pay such exorbitant fees."

In April and May 1991, FSB learned that Rattle Run Development was having trouble bringing sewer and water service to the development site. Consequently, on May 28, 1991, FSB declared that any commitment letters issued to borrowers were null and void because these amenities had not been provided to the development site. Then, in August 1991, China Township advised Rattle Run Development that, pursuant to the terms of the PUD, construction should cease and that it would issue no further building permits. The township cited the development's failure to obtain the letter of credit to finance the construction

of sewer and water service as its reason for refusing to issue additional building permits.[3]

### B. THE AITKENS' INVOLVEMENT IN THE VENTURE

The Aitkens entered a joint venture agreement with Rattle Run Real Estate Company in late 1989. In the agreement, the Aitkens agreed to obtain eighty percent financing for a model condominium and pay a twenty percent down payment to Rattle Run Real Estate Company, a partner in the joint venture. Rattle Run Real Estate agreed to build and decorate the model. In addition, the Aitkens agreed to lease the property to Rattle Run Real Estate for a year from the date of closing. In exchange, Rattle Run Real Estate promised to pay the mortgage payments, insurance, utilities, and prorated property taxes.

On January 31, 1990, the Aitkens met with Nels Rouleau, FSB's loan originator, to apply for the construction loan. Marilyn Aitken testified in her deposition that Rouleau indicated that FSB would provide construction and end loans to qualified borrowers. On July 11, 1990, the Aitkens loaned Rattle Run Development $50,000, and later an additional $25,000, on August 17, 1990, to help finance the construction of condominiums pending receipt of construction loans from FSB. On September 19, 1990, the Aitkens and FSB closed on the construction loan, and subsequently,

---

[3] FSB argues that the township's refusal to issue additional building permits also relieved it of the obligation to close on construction loans to persons whom it issued commitment letters. We agree. Under the express terms of those commitment letters, before closing on a construction loan would occur, a building permit was required, and they also state that the commitments would be null and void if certain additional conditions were not met. See discussion, at part IV, B.

FSB disbursed funds to finance the construction of the Aitkens' model condominium.

According to the Aitkens, after the development ran into the problems detailed above, Rattle Run Development could not afford to continue or make payments on the construction loans. Primarily, they contend that Rattle Run Development did not have the funds to continue because FSB refused to issue additional constructional loans, which not only depleted the financing source for construction but also thwarted financing for other projects, such as the water and sewer project. They further contend that as a direct consequence of FSB's refusal, their loan went into default.

### C. PROCEEDINGS IN THE COURT BELOW

On May 4, 1993, FSB sued the Aitkens for default on the construction loan agreement. The Aitkens countersued, arguing that FSB breached its contract with Rattle Run Development. The Aitkens argued that the existence of this contract was supported by evidence of the dealings between FSB and Rattle Run Development, including the January 3, 1990, letter. The Aitkens asserted that this evidence showed that FSB promised the development that it would finance construction loans for qualified borrowers, and that despite FSB's approval of qualified borrowers, FSB refused to close on construction loans for qualified borrowers. The Aitkens concluded that FSB's refusal caused the development to encounter financial problems and, consequently, the default of their construction loan. In seeking relief, the Aitkens claimed that, as third-party beneficiaries to the contract between FSB and Rattle Run Development, they were

entitled to damages precipitated by FSB's breach of its promise to finance construction loans because they detrimentally relied upon FSB's promise. They also argued that FSB was estopped to deny the existence of the agreement and the Aitkens' reliance thereon.

FSB moved for summary disposition of the counterclaim pursuant to MCR 2.116(C)(10). In its motion, FSB argued that the Aitkens could not claim breach of contract because they received a construction loan that was the subject of FSB's default action. Alternatively, FSB contended that, with regard to any agreement that existed between Rattle Run Development and FSB, the Aitkens were not third-party beneficiaries to that agreement and thus had no standing to pursue a breach of contract claim against FSB. Further, FSB argued that the Aitkens' estoppel claims could not be maintained because the Aitkens had received a loan from FSB. Finally, FSB argued that the Aitkens had not seen the January 3, 1990, letter, and therefore could not have relied on it. The trial court initially denied FSB's motion, holding that genuine issues of material fact existed regarding the agreement between FSB and Rattle Run Development.

Later, FSB renewed its motion for summary disposition with new evidence indicating that the township had advised Rattle Run Development to cease construction because of the development's failure to obtain the irrevocable letter of credit to finance installation of water and sewer service at the development. The Aitkens responded to the renewed motion, arguing only that FSB was not entitled to relief because its motion was an untimely motion for rehearing. The trial court granted the renewed motion, finding that FSB was excused from providing

construction loans because construction had stopped
as a result of Rattle Run Development's failure to
obtain the letter of credit. The court also held that Mr.
Aitken could not have detrimentally relied on the Jan-
uary 3, 1990, letter because he testified in his deposi-
tion that he had not seen the letter. Significantly, the
court emphasized that the Aitkens had not submitted
documentary evidence or affidavits to establish the
existence of a genuine issue of material fact in
response to the renewed motion for summary
disposition.

After prevailing with regard to the motion for sum-
mary disposition, FSB moved for summary disposition
of their complaint, also requesting attorney fees as
provided for the loan agreement. The trial court
granted this motion and awarded FSB attorney fees
incurred in the prosecution of its complaint. FSB then
moved for additional attorney fees, requesting fees
incurred in the defense of the counterclaim, arguing
that it was entitled to the fees because it was required
to prevail on the counterclaim in order to prevail on
its complaint. The trial court agreed and granted FSB's
motion. The Aitkens then filed this appeal from the
court's orders granting FSB's summary disposition
motion and awarding FSB attorney fees incurred in the
defense of the Aitkens' counterclaim.

## II. THE AITKENS' APPEAL

The Aitkens argue that the trial court made findings
with regard to disputed issues of material fact. Specif-
ically, the Aitkens contend that the trial court's con-
clusion that FSB was excused from its obligation to
provide loans was in error because FSB's refusal to
issue construction loans predated the township's

order to cease construction. In addition, they contend that all conditions for granting the loans had been met as evidenced by the issuance of three construction loans, including theirs, and FSB's approval of at least fifteen applicants for construction loans.

In addition, the Aitkens contend that the court failed to distinguish between *construction* and *end* loans. They contend that the prerequisites outlined in the January 3, 1990, letter were distinct for each type of loan: for closing a construction loan, the Aitkens argue, FSB required only a twenty percent down payment and that a borrower be "qualified"; on the other hand, for an end loan, FSB required that common amenities be in place, along with other conditions. The Aitkens further argue that, given that qualified borrowers had been approved for construction loans and three loans had been closed before the completion of common amenities, there were genuine issues of material fact regarding whether FSB breached its obligation to provide additional construction loans. They also allege that they detrimentally relied upon FSB's obligations to provide these funds when applying for their construction loan and when loaning money to the development. On the basis of these allegations, the Aitkens conclude that FSB is liable to them for breach of contract and detrimental reliance.

The Aitkens have intertwined their claims of contractual breach and detrimental reliance and do not adequately articulate on what basis they are entitled to relief. The fundamental problem here is that the Aitkens attempt to hold FSB liable for an alleged obligation to *another party*, Rattle Run Development. What they have not explained, and what the trial court did not resolve, is whether the *Aitkens* have

standing to bring their claim. Thus, to resolve the Aitkens' appeal, we address (1) whether the Aitkens have standing as third-party beneficiaries to enforce the contract between Rattle Run Development and FSB, and (2) given their claim of detrimental reliance, whether the Aitkens can base liability on an estoppel theory. Lastly, we address the Aitkens' argument that the court erred in awarding FSB attorney fees incurred in its defense of the counterclaim. The Aitkens contend that FSB was not entitled to attorney fees incurred in the defense of the counterclaim because the counterclaim was not based on the *same* agreement that was involved in the complaint.

We review de novo the trial court's order granting summary disposition to determine whether the moving party was entitled to judgment as a matter of law. *Stehlik v Johnson (On Rehearing)*, 206 Mich App 83, 85; 520 NW2d 633 (1994). A motion pursuant to MCR 2.116(C)(10) tests the factual basis underlying the plaintiff's claim. *Radtke v Everett*, 442 Mich 368, 374; 501 NW2d 155 (1993). In ruling on the motion, the trial court must consider the affidavits, pleadings, depositions, admissions, and other admissible documentary evidence submitted by the parties. MCR 2.116(G)(5); *SSC Associates Ltd Partnership v General Retirement System of the City of Detroit*, 192 Mich App 360, 364, 366; 480 NW2d 275 (1991). Giving the benefit of all reasonable doubt to the opposing party, the trial court must determine whether a record might be developed that would leave open an issue of material fact upon which reasonable minds could differ. *Id.* at 364. Summary disposition is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a

matter of law. *Mitchell v Dahlberg*, 215 Mich App 718, 725; 547 NW2d 74 (1996). [4]

### III. THE AITKENS' STANDING TO BRING A BREACH OF CONTRACT ACTION AGAINST FSB

Generally, one who is not a party to an agreement cannot pursue a claim for breach of the agreement. See *Gianotta v Holderid*, 143 Mich App 249, 252; 372 NW2d 326 (1985). The Aitkens claim that they have standing to assert a breach of contract claim against FSB because they are third-party beneficiaries of an agreement between FSB and Rattle Run Development. To establish standing as third-party beneficiaries and to assert a breach of contract claim against FSB, the

---

[4] The fact that the Aitkens are asking this Court to hold that summary disposition was improper because genuine issues of material fact exist is incredible given that they essentially forfeited an opportunity to make the same argument after FSB filed its renewed motion for summary disposition. The Aitkens' entire response to the renewed motion for summary disposition consisted of a two-page brief arguing that FSB was not entitled to relief because its renewed motion was in fact an untimely motion for rehearing. These responsive papers provide no arguments or references to support the Aitkens' claim on appeal that genuine issues of material fact were still at issue. The Aitkens contend that they supplied documentary evidence and arguments in response to the original motion for summary disposition and, because the trial court denied the original motion, the trial court should have reaffirmed its earlier holding. We disagree.

Parties opposing a motion for summary disposition are *required* to submit evidence to support their claim that a genuine issue of material fact exists. MCR 2.116(G)(4) (a party may not rest on its pleadings alone). A beleaguered trial court presiding over a factually complex case such as this one is not obligated literally to search its files to discover whether record evidence has previously been filed that supports a party's claims. MCR 2.116(G)(4). Because the Aitkens failed to respond as required to FSB's motion, we hold that the decision of the trial court should be affirmed on this basis in addition to the other reasons cited in this opinion for affirmance. Despite this conclusion, we have elected to address the merits of the Aitkens' counterclaim and review all the record evidence provided by the parties because this appeal requires resolution of purely legal issues for which all the necessary facts were presented. See *Providence Hosp v Nat'l Labor Union Health & Welfare Fund*, 162 Mich App 191, 194-195; 412 NW2d 690 (1987).

Aitkens must prove that FSB made a promise to Rattle Run Development to do or refrain from doing an act *directly* for the Aitkens' benefit. MCL 600.1405; MSA 27A.1405. [5]

---

[5] MCL 600.1405; MSA 27A.1405 defines third-party beneficiaries and the rights they possess:

Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.

(1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise has undertaken to give or to do or refrain from doing something *directly* to or for said person.

(2) (a) The rights of a person for whose benefit a promise has been made, as defined in (1), shall be deemed to have become vested, subject always to such express or implied conditions, limitations, or infirmities of the contract to which the rights of the promisee or the promise are subject, without any act or knowledge on his part, the moment the promise becomes legally binding on the promisor, unless there is some stipulation, agreement or understanding in the contract to the contrary.

(b) If such person is not in being or ascertainable at the time the promise becomes legally binding on the promisor then his rights shall become vested the moment he comes into being or becomes ascertainable if the promise has not been discharged by agreement between the promisor and the promisee in the meantime.

(c) If the promisee is indebted or otherwise obligated to the person for whose benefit the promise was made and the promise in question is intended when performed to discharge that debt or obligation, then the promisor and the promisee may, by mutual agreement, divest said person of his rights, if this is done without intent to hinder, delay or defraud said person in the collection or enforcement of the said debt or other obligation which the promisee owes him and before he has taken any legal steps to enforce said promise made for his benefit.

(3) Nothing herein contained shall be held to abridge, impair or destroy the rights which the promisee of a promise made for the benefit of another person would otherwise have as a result of such promise.

(4) The provisions of this section shall be construed to be applicable to contracts made prior to its enactment as well as to those made subsequent thereto, unless such construction is held to be unconstitutional, in which case they shall be held to be applicable

To determine whether a party is a third-party beneficiary as defined in MCL 600.1405; MSA 27A.1405, the Court must objectively review " 'the form and meaning of the contract itself.' " *Kammer Asphalt Paving Co, Inc v East China Twp Schools*, 443 Mich 176, 189; 504 NW2d 635 (1993) (citation omitted). Also, in *Rieth-Riley Constr Co, Inc v Dep't of Transportation*, 136 Mich App 425, 430; 357 NW2d 62 (1984), this Court set forth the following general principles:

> The law . . . clearly states that an objective standard is to be used which discerns the parties' intentions from the contract itself. Therefore the parties' motives and subjective intentions are not relevant in determining whether plaintiff is a third-party beneficiary. *Guardian Depositors Corp v Brown*, 290 Mich 433; 287 NW 798 (1939); *Jachim v Coussens*, 88 Mich App 648; 278 NW2d 708 (1979); *Local 80 Sheet Metal Workers International Ass'n, AFL-CIO v Tishman Construction Corp*, 103 Mich App 784; 303 NW2d 893 (1981). Not everyone who benefits in some way from a contract can be classified as a third-party beneficiary so as to be able to stand in the promisee's shoes and recover under the contract.

As an initial matter, we note that none of the documentary or testimonial evidence in the record identifies the Aitkens by name as direct beneficiaries of a promise by FSB to Rattle Run Development. The Aitkens assert that the language in the January 3, 1990, letter and statements made by representatives of FSB and the development indicate that FSB promised to provide construction loans to "qualified owner

---

only to contracts made subsequent to its enactment. [Emphasis added.]

occupant borrowers" without additional qualifications. If the beneficiary of the promise cannot be ascertained at the time the promisor becomes bound by his promise, then a person becomes vested as a third-party beneficiary only if his identity is ascertained before the promise is discharged by agreement between the promisor and the promisee. MCL 600.1405(2)(b); MSA 27A.1405(2)(b). The Aitkens arguably could have become identified "qualified borrowers" and third-party beneficiaries of the January 3, 1990, letter when the Aitkens were approved for the construction loan from FSB. It is *only* in this capacity that the Aitkens could claim a direct benefit under the terms of the January 3, 1990, letter.

Inasmuch as the Aitkens concede that FSB provided the construction loan to them and further do not contest FSB's conduct with respect to granting a loan to them, the Aitkens are not seeking to enforce a promise for their *direct* benefit. Instead, the Aitkens are seeking to enforce the promise allegedly made to the development that would benefit *other* qualified occupant-owner borrowers by the issuance of additional construction loans. Because the Aitkens actually received the benefits of the construction loan and are not seeking to enforce a promise that would provide them a *direct* benefit, we conclude that they have no standing to assert a breach of contract claim as a third-party beneficiary on behalf of others.[6] *Rieth-Riley, supra.*

---

[6] At best, the Aitkens would only have benefited incidentally from the granting of construction loans to other qualified occupant-owner borrowers. This alone is insufficient to confer standing as a third-party beneficiary to seek enforcement of the agreement. In *Greenlees v Owen Ames Kimball Co,* 340 Mich 670, 676; 66 NW2d 227 (1954), the Supreme Court quoted approvingly from 12 Am Jur, Contracts, § 282, p 834:

For the same reasons, the Aitkens do not acquire standing by virtue of their status as investors and shareholders in Rattle Run Development. There is no evidence that FSB made a promise to do something or refrain from doing something directly for the benefit of Rattle Run Development's investors. The language of the January 3, 1990, letter could not reasonably be construed as a promise directly to benefit the investors in the joint venture. Moreover, it is well established that individual shareholders generally cannot assert an individual claim arising from injury to the company, see *Michigan Nat'l Bank v Mudgett*, 178 Mich App 677, 679-680; 444 NW2d 534 (1989), and that individual partners can only assert a claim not independent of that of the partnership if the claim is brought in the name and on behalf of the partnership itself. See *George Morris Cruises v Irwin Yacht & Marine Corp*, 191 Mich App 409, 413-414; 478 NW2d 693 (1991).

We conclude that the Aitkens have no standing to raise their breach of contract claim.

---

"The principle that one not a party or privy to a contract but who is the beneficiary thereof is entitled to maintain an action for its breach is not so far extended as to give to a third person who is only indirectly and incidentally benefited by the contract the right to sue upon it. An incidental beneficiary has no rights under the contract. A third person cannot maintain an action upon a simple contract merely because he would receive a benefit from its performance or because he is injured by the breach thereof. Where the contract is primarily for the benefit of the parties thereto, the mere fact that a third person would be incidentally benefited does not give him a right to sue for its breach."

See also *Grand Blanc Landfill, Inc v Swanson Environmental, Inc*, 186 Mich App 307, 310-311; 463 NW2d 234 (1990).

IV. ESTOPPEL CLAIMS

A. EQUITABLE ESTOPPEL

The Aitkens argue that FSB is estopped to deny facts that establish their entitlement to damages as third-party beneficiaries of its agreement with Rattle Run Development. This claim is, in part, premised on a theory of equitable estoppel. Equitable estoppel, however, is a doctrine, not a cause of action that would entitle a plaintiff to damages, although it may assist a plaintiff in support of its primary claim. *Hoye v Westfield Ins Co*, 194 Mich App 696, 704-705; 487 NW2d 838 (1992). As discussed above, the Aitkens have not established that they are third-party beneficiaries of an agreement between FSB and Rattle Run Development. Hence, this doctrine provides no assistance to the Aitkens' breach of contract claim against FSB.

B. PROMISSORY ESTOPPEL

The Aitkens' promissory estoppel claim is a reprise of their contract claim under a different theory. They seek again to step into the shoes of the development and contend that they detrimentally relied upon a purported "agreement" between FSB and the development. The Aitkens allege that under this "agreement," FSB unconditionally promised to issue construction loans to "qualified borrowers."

The Aitkens argue that the agreement is evidenced by the language in the January 3, 1990, FSB letter to Rattle Run Development. The letter from FSB to the development states that FSB "will provide construction draw and end loan residential first mortgages to qualified borrowers . . . First Security will require . . . a minimum of 20% down payment . . . [and] will only

lend to qualified owner occupant borrowers." The Aitkens characterize this statement as a commitment and construe this language as an unconditional promise to lend money once the borrower is (1) approved, and (2) provides a twenty percent down payment. FSB responds that the letter is not a commitment, and that even under the language in this letter, there were additional conditions and qualifications that were not satisfied, so that any obligation to issue the loans never arose. The Aitkens contend that FSB cannot now maintain that other conditions had not been satisfied because approximately fifteen borrowers had been approved, and because FSB had issued three construction loans, including their own construction loan.

The Aitkens argue that they detrimentally relied upon FSB's alleged commitment to the development. Specifically, they allege that in reliance on this commitment, they obtained their construction loan from FSB and also loaned money to the development. The Aitkens conclude that on the basis of this reliance, they are entitled to damages resulting from FSB's later refusal to continue issuing the construction loans to qualified borrowers.

Upon review of the entire record, we conclude that the Aitkens cannot prevail on their claim of promissory estoppel. The Aitkens cannot establish that there is a clear and definite promise under which FSB's obligation to issue loans became executory without further qualifications or conditions so that FSB's later refusal constituted a breach of that promise. Indeed, the evidence upon which the Aitkens rely, taken in a light most favorable to them, only supports the conclusion that the parties agreed to an additional condition before a closing would occur on the construction

loans, and that the condition was never satisfied. Also, the Aitkens provide no evidence that they were aware of an alleged commitment by FSB to issue loans when they claim to have acted in reliance on that promise. Hence, the Aitkens cannot establish that they relied in fact on an actual, clear, and definite promise by FSB, or that their acts in reliance on the alleged commitment were reasonable.

To establish promissory estoppel, the Aitkens must prove the following:

> "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or *a third person* and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." [*Ypsilanti Twp v General Motors Corp*, 201 Mich App 128, 133-134; 506 NW2d 556 (1993), quoting 1 Restatement Contracts, 2d, § 90, p 242 (emphasis added).]

For the reasons we have already identified, the Aitkens cannot stand in the shoes of the development, the alleged promisee. To prevail on this claim as a third party, the Aitkens must first establish that FSB made a promise that FSB intended, or should have reasonably expected, that the Aitkens would rely upon. *Ypsilanti Twp, supra* at 133-134.

Promissory estoppel requires an actual, clear, and definite promise. *Id.* at 134, citing *State Bank of Standish v Curry*, 442 Mich 76, 84-85; 500 NW2d 104 (1993). " '[R]eliance is reasonable only if it is induced by an *actual promise*.' " *Ypsilanti Twp, supra* at 134, quoting *Standish, supra* at 84 (emphasis added). " 'A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to

justify a promisee in understanding that a commitment has been made.' "[7] *Id.* at 85. Moreover, a promise must be distinguished from a statement of opinion, a prediction of future events, or a party's will, wish, or desire for something to happen. *Id.* at 86, 89.

To determine whether there was a promise that the Aitkens could have relied upon and the nature of that promise, we must look to the words and actions surrounding the transaction in question as well as the nature of the relationship between the parties and the circumstances surrounding their actions. *Id.* at 86. These factors are reviewed objectively to ascertain whether a voluntary commitment has been made. *Id.* "For a promise to loan money in the future to be sufficiently clear and definite, some evidence must exist of the material terms of the loan, including the amount of the loan, the interest rate, and the method of repayment." *Id.* at 88.

At the outset, we note that most of the evidence the Aitkens rely upon in support of this claim does not remotely support an inference that FSB made a clear promise to loan money to qualified borrowers without further conditions.[8] However, four elements of evidence offered by the Aitkens purporting to

---

[7] The Supreme Court adopted the definition of the term "promise" stated in 1 Restatement Contracts, 2d, § 2, p 8. *Standish, supra* at 85.

[8] For example, the Aitkens argue that FSB's signs and literature were present on the development site. But, absent evidence reciting what FSB's signs or literature stated, their mere presence on the development site does not support an inference that FSB clearly promised to issue construction loans. The Aitkens also contend that the development's representative, Amos Knoll, told them that FSB was providing construction and end loans in the development. Liability against FSB as the *promisor* cannot be based upon statements made by Amos Knoll, representative of the *promisee*, Rattle Run Development. At best, plaintiffs were mere incidental third-party beneficiaries. See *Kammer Asphalt, supra* at 190, quoting *Greenlees,* n 6 *supra.*

show FSB's alleged unqualified promise to extend construction loans deserve closer scrutiny. These include the January 3, 1990, letter, FSB's issuance of three construction loans in the development, including the Aitkens' loan, FSB's construction loan commitment letters, which the Aitkens allege were provided to approximately fifteen other borrowers, and alleged statements made to them by Nels Rouleau, FSB's loan representative.

Because the Aitkens primarily rely upon the terms of the January 3, 1990, letter, we address first whether the letter was a sufficiently clear and definite promise to loan money. While this letter does indicate that FSB will provide construction loans to "qualified borrowers" who make a twenty percent down payment, the letter does not define what the term "qualified borrower" means, nor does the letter specify other material terms of such a loan. Thus, this letter is insufficient to meet the promise specificity requirements set forth in *Standish, supra.*

Looking beyond this letter, however, we note that FSB did issue three construction loans, including the Aitkens' loan, and FSB sent commitment letters to other borrowers who applied for construction loans. The Aitkens contend that FSB was clearly obligated to issue construction loans in accordance with the commitment letters because FSB had already issued three construction loans. FSB argues that additional construction loans were not issued after the first three because the township refused to issue additional building permits to allow for the construction of addi-

tional condominiums.[9] Because the nature and scope of a promise may be inferred from the parties' conduct and course of dealing as well as from oral and written representations, *Standish, supra* at 86, we examine whether FSB's obligation to issue construction loans, as stated in these commitment letters, ever arose.

The express language of these letters of commitment[10] states that the loan applications were reviewed and approved "subject to the following terms and conditions." Significantly, the letters state that before the bank would close a construction loan, "the following condition[] must be complied with . . . prior to, or at the time of the construction closing . . . 5. [issuance of a] Building Permit." The letter further warns that failure to satisfy those conditions could render the commitment letter null and void. The undisputed evidence shows that after the first three building permits were issued for the Aitkens and two other borrowers, the township issued no additional building permits to build condominiums.[11] Consistent with the number of permits issued, only three construction loans were closed. In other words, given that no additional building permits were issued, FSB's obligation to

---

[9] The purpose of the construction loan is to finance the building of a condominium, and because a condominium cannot lawfully be built without a building permit, no funds were needed to finance its construction until a building permit was issued.

[10] The Aitkens submitted this evidence in response to the original motion for summary disposition as proof that other borrowers were deemed "qualified" by FSB.

[11] Although the Aitkens did not submit their own approval papers as evidence in this case, the Aitkens stated that their loan and two other loans were closed *after* a building permit was issued. Hence, the Aitkens should have been aware that a similar condition would be imposed on other loan applicants.

close another construction loan never arose because that express condition was never satisfied.

Consequently, this evidence establishes that the parties agreed that an additional condition precedent must be satisfied before the loans could be closed—the issuance of a building permit. Further, it is undisputed that this did not occur after the first three permits were issued. Because the condition was never satisfied, FSB's obligation to issue additional loans never arose and the Aitkens' contention that FSB was obligated to do so is without merit. See *Bivans Corp v Community Nat'l Bank of Pontiac*, 15 Mich App 178, 182; 166 NW2d 270 (1968) ("plaintiff cannot construct a detrimental reliance or estoppel theory on a conditional promise, especially when the condition did not take place").

Lastly, we review the alleged statements made by Nels Rouleau, FSB's loan originator, to the Aitkens at the time they applied for the construction loan. Marilyn Aitken testified that Nels Rouleau informed her that FSB would furnish construction and end loans to a qualified borrower, and that Rouleau explained that a twenty percent down payment was required.[12] Viewed in context, Rouleau's comments were general discussions regarding FSB's willingness to finance construction of the condominiums at a future date and the contingencies upon which the financing would occur. See *Standish, supra* at 87. Thus, although these statements reflect FSB's wish, will, or desire to

---

[12] Mrs. Aitken also testified that from Rouleau's statements, she believed that FSB would loan the money to other borrowers, and she relied on that belief when applying for the construction loan. However, Marilyn Aitken's *subjective* belief that others would receive loans cannot support her claim of promissory estoppel. *Schmidt v Bretzlaff*, 208 Mich App 376, 379; 528 NW2d 760 (1995).

loan money to qualified borrowers seeking to construct condominiums, they did not rise to the level of FSB's commitment to lend money to specific borrowers *at that time.* Significantly, the alleged statements made by Nels Rouleau did not include the material terms of the alleged promise to issue a construction loan, such as the amount of the loan, the interest rate, and the method of repayment. *Id.* at 88-89.

In the alternative, even if the Aitkens could establish that FSB's obligation became executory, the Aitkens' claim would still fail because they cannot establish that they relied in fact upon an alleged promise. We reiterate that the interest protected in a promissory estoppel claim is " 'reasonable' " reliance and that reliance, to be reasonable, must be based on " 'an actual promise.' " *Id.* at 84 (citation omitted). After reviewing the Aitkens' proofs, we conclude that the Aitkens have failed by a wide margin to establish "reasonable" reliance.

The Aitkens allege that they engaged in the following acts in reliance upon the January 3, 1990, letter: (1) obtaining a construction loan from FSB on January 31, 1990, and (2) loaning money to the development in July and August 1990. It is undisputed, however, that the Aitkens had not seen the letter when they did these things, as they admitted in their respective depositions. The Aitkens could not, therefore, have relied upon the "promise" that they allege was made in this letter that they assert is so critical to their claim.

The Aitkens also point to the issuance of other construction mortgages as support for their contention that there were no outstanding preconditions that precluded FSB from issuing other construction loans. Again, the Aitkens' evidence does not support their

argument that this factor was in existence when they engaged in their alleged acts of reliance. Their own mortgage was closed on September 19, 1990, and the Aitkens have not identified the dates when the other two construction loans were closed. Further, the evidence that the Aitkens submitted to support this claim includes a printout of an originator production report, dated November 14, 1990, that is not comprehensible, three approval letters to prospective purchasers, dated October 2, 1990, December 18, 1990, and February 19, 1991, and Nels Rouleau's deposition testimony that approximately fifteen other applicants were issued commitments for construction loans. Reviewing this evidence most favorably to the Aitkens, we cannot find any indication that a construction loan was issued or closed before January 31, 1990, when they applied for their loan, and in July and August 1990, when they loaned the money to the development. Consequently, we conclude that this evidence cannot support an inference that the issuance of other construction loans was a fact on which the Aitkens relied.[13]

Lastly, because Nels Rouleau's alleged statements did not rise to the level of an actual, clear, and definite promise to loan money, it cannot support the Aitkens' claim of reasonable reliance. *Id.* at 84.

In summary, the Aitkens have not established that they are entitled to damages for detrimental reliance premised upon a theory of promissory estoppel. FSB's

---

[13] Even if certain loans were issued before this time, this would not be sufficient evidence of a promise that other subsequent loans would be issued. Compare *Standish, supra* at 87, where the Court noted that "general discussions of extending credit or 'past renewals of credit should not lead a borrower to reasonably believe that credit will be extended or renewed again and again.' " (Citation omitted.)

obligation to close additional construction loans never arose after the township ceased issuing building permits. Alternatively, on the basis of the other evidence submitted, the Aitkens have not established that they were aware of an actual, clear, and definite promise at the times they allege to have acted in detrimental reliance, and, therefore, could not have relied, in fact, on such a promise.[14]

### V. CONTRACTUAL AGREEMENT FOR ATTORNEY FEES

We affirm the order awarding FSB attorney fees. The decision to award attorney fees is within the trial court's discretion. *Mitchell, supra* at 729. FSB sought attorney fees pursuant to the contractual language that allowed fees that were spent in "connection with" the loan agreement.[15] Contractual provisions for the payment of reasonable attorney fees are judicially enforceable. *Central Transport, Inc v Fruehauf Corp,* 139 Mich App 536, 548; 362 NW2d 823 (1984); *Michigan Nat'l Leasing Corp v Cardillo,* 103 Mich App 427, 436; 302 NW2d 888 (1981). Further, " '[t]he cardinal rule in the interpretation of contracts is to ascertain the intention of the parties.' " *Goodwin, Inc v Orson*

---

[14] Furthermore, there is evidence that the Aitkens' application for the mortgage was not directly induced by FSB's alleged promise. One year before closing on their construction loan, the Aitkens entered a joint venture agreement with Rattle Run Real Estate Company, agreeing to obtain financing for a model condominium. As investors in the development, they were obligated to acquire financing for the model. These contractual obligations predated and existed entirely independently of FSB's involvement in providing construction loans.

[15] The construction loan agreement provides:

If Lender becomes obligated to pay an attorney's fees in connection with this Agreement, said note or mortgage including appeals, Borrower agrees to pay the same and payment of same shall be secured by the lien of said mortgage.

*E Coe Pontiac, Inc,* 392 Mich 195, 209; 220 NW2d 664 (1974), quoting *McIntosh v Groomes,* 227 Mich 215, 218; 198 NW 954 (1924).

The Aitkens alleged that they detrimentally relied upon FSB's obligations to provide these funds when applying for the construction loan at issue in FSB's complaint and that default of that loan directly resulted from FSB's breach. The Aitkens raised these breach of contract and estoppel claims both as a defense to FSB's complaint and as a counterclaim. Although no Michigan cases have addressed this issue, we find dispositive the holdings in other jurisdictions considering similar language that have granted attorney fees if defeating the counterclaim was necessary to prevail on the party's complaint. See, e.g., *Siligo v Castellucci,* 21 Cal App 4th 873, 879-880; 26 Cal Rptr 2d 439 (1994); *Wright v Doolin,* 158 Vt 317, 321-322; 607 A2d 1137 (1992); *Vistaco, Inc v Prestige Properties, Inc,* 559 So 2d 744, 745 (Fla App, 1990); *Carefree Foliage, Inc v American Tours, Inc,* 153 Ill App 3d 190, 195-197; 505 NE2d 1039 (1987). Therefore, the trial court correctly concluded that, in order for FSB to prevail on its complaint, FSB was required to defeat the Aitkens' counterclaim, and the award of attorney fees was proper.

Affirmed.